**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

PAUL WILLIAMS,

Petitioner,

v.

WILLIAM BARR, *et al.*,

Respondents.

No. 4:20-CV-00704

(Judge Brann)

**MEMORANDUM OPINION**

**MAY 6, 2020**

## I. BACKGROUND

Paul Williams filed this emergency 28 U.S.C. § 2241 petition alleging that his continued civil detention violates his due process rights under the Fifth Amendment to the United States Constitution.[1] Specifically, Williams alleges that his detainment constitutes prohibited punishment, and amounts to deliberate indifference to his serious medical needs.[2] Also pending before the Court is Williams' motion to appoint counsel.[3]

Williams is a citizen of Trinidad and Tobago who was admitted to the United States as a permanent resident in 2000.[4] In 2016, Williams was convicted in federal

---

[1] Doc. 1.

[2] *Id.*

[3] Doc. 3.

[4] *Id.* at 6; Doc. 6-1 at 5.

court of conspiracy to possess with intent to distribute a controlled substance and sentenced to 60 months' imprisonment.[5] Following this conviction, Williams was ordered removed from the country.[6]

Since 2018, Williams has been held in civil detention by the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), and is currently confined at York County Prison ("York County") pending his removal from the country.[7] While in ICE custody, Williams was diagnosed as prediabetic, which he alleges places him at an increased risk of death or serious injury if exposed to Coronavirus Infectious Disease 2019 ("COVID-19").[8]

Upon receipt of Williams' emergency § 2241 petition, the Court directed the Government to file a response within three days.[9] The Government submitted a timely response and argues that Williams' petition should be denied because his conditions of confinement do not violate the Constitution.[10] The matter is now ripe for disposition and, for the reasons discussed below, the petition will be denied.

---

5 Doc. 6-1 at 5.

6 *Id.*

7 *Id.*; Doc. 1 at 6, 8.

8 Doc. 1 at 7.

9 Doc. 4.

10 Doc. 6.

**A. COVID-19**

In recent months, COVID-19 has swept across the world and been declared a global health pandemic by the World Health Organization.[11] "Because COVID-19 is caused by a novel form of the coronavirus, humans have no immunity to the virus and, currently, there is no cure, vaccine, or known anti-viral treatment for COVID-19."[12] "The virus is highly contagious, and is spread through respiratory particles of moisture and mucous that are transmitted through the air or which fall on surfaces that are later touched by an individual."[13] "The primary method used to combat the spread of COVID-19, socially distancing, seeks to maintain enough distance between individuals to break the chain of transmission—generally at least six feet."[14]

Most individuals infected with COVID-19 develop only mild or moderate respiratory symptoms and recover with no medical intervention, but in a minority of cases individuals experience serious illness or death.[15] Some populations—most notably the elderly and those with certain preexisting medical conditions—are more

---

[11] *CDC's Response to COVID-10*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/index.html (last visited May 1, 2020).

[12] *Engelund v. Doll*, No. 4:20-CV-00604, 2020 WL 1974389, at *1 (M.D. Pa. Apr. 24, 2020).

[13] *Id.*

[14] *Id.*

[15] *Q&A on Coronavirus (COVID-19): What Are the Symptoms of Coronavirus*, World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited May 1, 2020).

susceptible to developing serious illness than others.[16] Underlying medical conditions that increase an individual's susceptibility to COVID-19 include: chronic lung disease, moderate to severe asthma, serious heart conditions, compromised immune systems, severe obesity, diabetes, or liver disease.[17] Significantly, while diabetes is listed as such an underlying medical condition, the Centers for Disease Control and Prevention lists diabetes as "including type 1, type 2, or gestational," but does not include prediabetes as a condition that increases one's risk related to COVID-19.[18] "Of those infected with COVID-19, approximately 80% develop mild or moderate symptoms and 20% require hospitalization—with approximately 2-3% of afflicted individuals dying from the virus."[19]

The spread of COVID-19 has thus far been rapid and inexorable. As of May 5, 2020, there are 3,603,217 reported cases globally, with 252,102 reported deaths.[20] As of May 4, 2020, the number of confirmed cases in the United States stands at

---

16 *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 1, 2020).

17 *Id*.

18 *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness, Diabetes*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#diabetes (last visited May 1, 2020).

19 *Engelund*, 2020 WL 1974389, at *1.

20 Johns Hopkins University, Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited May 5, 2020).

1,122,486, while there were more than 65,735 deaths in the United States.[21] By that same date, in Pennsylvania there were 50,092 confirmed cases of COVID-19, with 2,458 COVID-19 related fatalities.[22] Also as of May 4, 2020, nationwide 606 ICE detainees have tested positive for COVID-19, but none have died.[23] In York County, one ICE detainee tested positive for COVID-19 on April 3, 2020,[24] but there have been no other reported cases in the facility since that date.[25]

### B. Conditions of Confinement

At York County, detainees are confined in dormitory-style rooms that, in ordinary circumstances, contain fifty detainees, with beds spaced approximately two feet apart.[26] York County has the capacity to house 2,245 individual and "has historically often operated near capacity."[27] As of the morning of April 29, 2020, York County housed 1,180 individuals.[28]

---

21 *Coronavirus Disease 2019 (COVID-19): Cases of Coronavirus Disease (COVID-19) in the U.S.*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 4, 2020).

22 *COVID-1 Data for Pennsylvania*, Pennsylvania Department of Health, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited May 4, 2020).

23 Immigration and Customs Enforcement, ICE Guidance on COVID-19: Confirmed Cases, https://www.ice.gov/coronavirus (last visited May 5, 2020).

24 Doc. 6-1 at 6.

25 Immigration and Customs Enforcement, ICE Guidance on COVID-19: Confirmed Cases, https://www.ice.gov/coronavirus (last visited May 5, 2020).

26 *Engelund*, 2020 WL 1974389, at *4.

27 Doc. 6-1 at 2.

28 *Id.*

York County provides detainees with "daily access to sick calls in a clinical setting" as well as "onsite medical staff 24 hours a day, 7 days a week with the ability to admit patients to the local hospital for medical, specialty, or mental health care."[29] Since the start of the current pandemic, York County has taken several measures to mitigate the threat of COVID-19 within the facility. During intake medical screenings, detainees are assessed for fever and respiratory illness and are asked whether, in the past fourteen days, they have had close contact with a person infected with COVID-19 or have traveled through areas with sustained community transmission.[30]

Detainees with symptoms of COVID-19 are placed in isolation and tested for the virus.[31] If any individuals test positive, they remain isolated and are treated; if necessary, they are transferred to a local hospital for further treatment.[32] Asymptomatic individuals are placed in "cohorts"[33] with restricted movement for a period of fourteen days following their last exposure to COVID-19, which is thought

[29] *Id.* at 3.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] According to the Government, "[c]ohorting is an infection prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients. Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases." *Id.*

to be the outer end of the virus' incubation period.[34] The detainees are monitored daily for fever and symptoms of respiratory illness.[35]

York County also provides inmates with soap, water, and "hard surface disinfectant."[36] Each detainee is issued a bar of soap for use, which is "immediately" replaced upon exhaustion.[37] Alcohol-based hand sanitizer is available for staff but, for security purposes, is not provided to detainees.[38] "High traffic and contact areas are cleaned repeatedly throughout the day. The facility administration is encouraging both staff and the general population to use these tools often and liberally."[39] Medical personnel also "conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms."[40]

According to the Government, protective masks have been provided to detainees to help prevent the spread of COVID-19:

> All detainees and inmates were issued surgical masks to wear on or about April 7, 2020. All detainees and inmates were issued a second surgical mask on or about April 14, 2020. Detainees and inmates must wear their issued mask anytime they are out of their cell. In all "dormitory" housing areas, detainees and inmates must wear masks

---

34 *Id.*

35 *Id.*

36 *Id.* at 3-4.

37 *Id.* at 4.

38 *Id.* The Centers for Disease Control and Prevention ("CDC") recommends the use of alcohol-based hand sanitizer only "[i]f soap and water are not readily available." How to Protect Yourself and Others, *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 1, 2020).

39 Doc. 6-1 at 4.

40 *Id.* at 7.

> when not sleeping. If they can wear the mask while sleeping it is preferred, but not mandatory. The detainee or inmate may remove the mask to eat, take drinks, and to shower. All inmates and detainees must wear their mask during recreation. The masks will be laundered once a week. One mask will be placed in their laundry bag and sent out in accordance with the housing unit's normal laundry schedule. All detainees and inmates are not permitted to wash their own masks. Detainees and inmates must follow all directions concerning the donning and doffing of masks. These directions were provided to each inmate when they received their mask on April 8, 2020. Detainees on isolation status are required to wear a N-95 mask when they leave a cohorted housing unit. Additionally, any detainees being transported to a hospital or outside medical appointment or as directed by . . . medical staff, are required to wear a surgical mask. Detainees and inmates were instructed to wash their hands thoroughly before touching the mask.[41]

Detainees who refuse to wear a mask are removed from their housing unit and placed in an isolated cell.[42]

York County has also begun taking steps to protect the prison from outside exposure. York County now screens all staff and vendors when they enter the facility, including the use of body temperature checks,[43] and requires that all staff or personnel entering the facility wear an N-95 mask.[44] The facility also limits contact between detainees and their visitors by permitting only telephonic contact or non-contact legal visits in the facility's visitation room.[45]

---

41 *Id.* at 6.

42 *Id.* at 7.

43 *Id.* at 4.

44 *Id.* at 6.

45 *Id.* at 4.

## II. DISCUSSION

The dispute as to the merits of Williams' claims centers around two issues. First, the Government asserts that the relief sought is not appropriate in a § 2241 petition because Williams seek release from custody, rather than changes to his conditions of confinement.[46] Second, the Government argues that Williams' claims are without merit, as his conditions of confinement do not amount to unconstitutional punishment and he receives adequate medical care.[47]

### A. Motion to Appoint Counsel

The Court will first address Williams' motion to appoint counsel to assist him in this matter.[48] "There is no 'automatic' constitutional right to counsel in a federal habeas corpus proceeding."[49] Rather, under the relevant statutory authority, if "the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under section 2241, 2254, or 2255 of title 28."[50] To determine whether the interests of justice require the appointment of counsel, the United States Court of Appeals for the Third Circuit has held that:

---

[46] Doc. 6 at 10-12.

[47] *Id.* at 12-23.

[48] Doc. 3.

[49] *Reese v. Fulcomer*, 946 F.2d 247, 263 (3d Cir. 1991), *superseded on other grounds by statute*, 28 U.S.C. § 2254(d).

[50] 18 U.S.C. § 3006A(a)(2)(b).

> the district court must first decide if the petitioner has presented a nonfrivolous claim and if the appointment of counsel will benefit the petitioner and the court. Factors influencing a court's decision include the complexity of the factual and legal issues in the case, as well as the *pro se* petitioner's ability to investigate facts and present claims. Courts have held, for example, that there was no abuse of a district court's discretion in failing to appoint counsel when no evidentiary hearing was required and the issues in the case had been narrowed, or the issues were straightforward and capable of resolution on the record, or the petitioner had a good understanding of the issues and the ability to present forcefully and coherently his contentions.[51]

Here, appointment of counsel is not warranted. Williams' petition demonstrates that he fully comprehends the issues in this case and is capable of researching the law and marshalling facts in support of his fairly straightforward petition. Most importantly, as discussed below, the necessary facts are fully developed, and Williams' claims are without merit. The Court thus concludes that appointment of counsel would not benefit Williams or the Court, and Williams' motion to appoint counsel will be denied.

### B. Merits of Williams' Claims

Before turning to the merits of Williams' claims, the Court may quickly address Respondents' contention that Williams may not seek release from custody through his § 2241 petition.[52] The Court recently rejected a nearly identical argument in a previous case.[53] In *Engelund v. Doll*, this Court determined "that

---

51 *Reese*, 946 F.2d at 263-64 (internal quotations omitted).

52 *Id.* at 10-12.

53 *Engelund*, 2020 WL 1974389, at *7.

precedent establishes—at a minimum—that certain extraordinary conditions of confinement may warrant a habeas remedy, particularly where those conditions would mark a fundamental shift in the nature of Petitioners' confinement."[54] Those conditions are present here and, consequently, Williams may seek release from custody by way of his § 2241 petition.

Turning then to the merits of the petition, the Government argues that no constitutional violation has occurred.[55] First, the Government asserts that Williams' conditions of confinement do not amount to the unconstitutional punishment of a civil detainee, in violation of the Fifth Amendment to the United States Constitution.[56] Second, the Government argues that York County has not been deliberately indifferent to Williams' medical needs.[57]

---

54 *Id.* (brackets and internal quotation marks omitted). *See also Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases and noting that "several judges within this District have had occasion to consider this same question and have all concluded that a habeas remedy can address a conditions of confinement claim, particularly in the context of the COVID-19 pandemic").

55 Doc. 6 at 12-23.

56 *Id.* at 12-13.

57 *Id.* at 13-23. Because Williams is a civil detainee, his claims proceeds under the Fifth Amendment, rather than the Eighth Amendment, although the elements of a claim under the Fifth Amendment are identical to a claim under the Eighth Amendment. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1877 (2017) (noting that while plaintiff's "'deliberate indifference' claim . . . [proceeded] under the Fifth Amendment's Due Process Clause, not the Eighth Amendment's Cruel and Unusual Punishment Clause . . . that is because the latter applies to convicted criminals while the former applies to pretrial and immigration detainees" (Breyer, J., dissenting)); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (stating that "the due process rights of a person [under the Fifth Amendment] are at least as great as the Eighth Amendment protections available to a convicted prisoner"). *See also Powers-Bunce v. D.C.*, 541 F. Supp. 2d 57, 66 (D.D.C.) ("The Court looks to the two-part analysis laid out in *Farmer v. Brennan*, 511 U.S. 825 (1994), to decide whether

**i. *Conditions of Confinement***

With respect to Williams' claim that conditions at York County violate the Constitution, he must demonstrate that his conditions of confinement "amount to punishment of the detainee."[58] "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, [this Court] may infer that the purpose of the governmental action is [unconstitutional] punishment."[59] Stated differently, the Court must consider "whether the conditions and restrictions of the Jail were rationally connected to these valid objectives and whether the conditions and restrictions were excessive in relation to these objectives."[60]

In assessing whether a governmental interest is legitimate, the Supreme Court has not "detail[ed] the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention."[61] However, the Supreme Court has recognized that ensuring detainees' presence at hearings, along with "the effective management of the detention facility once the individual is confined"

---

a Fifth Amendment violation was perpetrated by the individual Defendants), *reconsidered in part on other grounds*, 576 F. Supp. 2d 67 (D.D.C. 2008).

[58] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[59] *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (internal quotation marks omitted).

[60] *Union Cty. Jail Inmates v. Di Buono*, 713 F.2d 984, 993 (3d Cir. 1983).

[61] *Bell*, 441 U.S. at 540.

constitute legitimate governmental interests.[62] The Third Circuit has also held, in an unpublished opinion, that the Government has a "legitimate . . . interest[] in reducing the flight risk posed by prisoners facing removal."[63]

Viewed under this standard, the Court concludes that Williams' conditions of confinement do not amount to unconstitutional punishment. First, it is beyond cavil that the Government has a legitimate governmental interest in preventing Williams from absconding and avoiding removal. Second, Williams' continued confinement is reasonably related to that legitimate governmental interest, as it guarantees that Williams will attend his deportation proceedings.

Although there are other methods that may help ensure that Williams complies with deportation proceedings, detainment is the only method that guarantees the fulfillment of the Government's goal. Moreover, the relevant question is not whether there are other, less restrictive methods at the Government's disposal, or even whether the Government's chosen course of action is the wisest or best way to proceed. The only limitation on the Government's ability to act is that the chosen course of action be reasonably related to its legitimate goal. Here, that standard is clearly satisfied.

The current conditions at York County do not undermine this conclusion. The Court recognizes that "[p]risons present unique concerns regarding the spread of this

---

62 *Id.*

63 *Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134 (3d Cir. 2017).

virus; by their very nature, prisons are confined spaces unsuited for 'social distancing.'"[64] Nevertheless, CDC guidelines specifically contemplate that individuals will be confined within prisons during the duration of this pandemic.[65] More importantly, conditions no longer resemble the "unsanitary, tightly-packed environments" that led a different judge in this District to order the release of ICE detainees.[66] To the contrary, the record reflects that York County has taken proactive measures to prevent or limit the spread of COVID-19 and to ensure the health of its detainees.

First, although York County does not permit the type of social distancing that individuals may undertake in their homes,[67] the facility has removed many detainees and is now operating far below its historical capacity: as of April 29, York County was operating at approximately fifty-three percent capacity.[68] Accordingly, there may now only be 26 or 27 individuals in a room, rather than 50 as before.

Second, York County is taking significant measures to sanitize the detainees' environment, as well as prevent the introduction or spread of COVID-19 within the facility. Thus, York County has incorporated into its intake medical screenings test

---

64 *Verma*, 2020 WL 1814149, at *4.

65 *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 1, 2020).

66 *Thakker*, 2020 WL 1671563, at *8.

67 *See* Doc. 1 at 13, 20.

68 Doc. 6-1 at 2.

questions designed to elicit whether an incoming detainee has potentially been exposed to COVID-19.[69] Detainees with symptoms of COVID-19 are placed in isolation, tested, and treated; asymptomatic individuals are cohorted and restricted in their movements, and monitored daily for symptoms.[70]

York County provides inmates with soap, water, and "hard surface disinfectant" that is replaced when exhausted.[71] Alcohol-based hand sanitizer is provided to staff, and "[h]igh traffic and contact areas are cleaned repeatedly throughout the day."[72] York County has provided all inmates with surgical masks that they are to wear at nearly all times, while staff and inmates in isolation must wear N-95 masks.[73] The facility has taken steps to prevent COVID-19 from entering the facility from outside: all staff and vendors are screened when they enter the facilities, including with body temperature checks, and meetings with visitors are non-contact only.[74]

Third, York County implemented medical procedures to ensure that sick detainees are promptly tested for COVID-19 and, if necessary, quarantined and

---

[69] *Id.* at 3.

[70] *Id.*

[71] *Id.* at 3-4.

[72] *Id.* at 4.

[73] *Id.* at 4, 6.

[74] *Id.* at 7.

treated.[75] Moreover, medical staff "conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms."[76]

The sum of these measures ensures that Williams' conditions of confinement are no longer unconstitutionally overcrowded or unsanitary. Indeed, the measures have been incredibly effective at curbing the introduction or spread of COVID-19 in York County: since the measures have been put into place, not a single ICE detainee at York County has tested positive for COVID-19.[77]

Judges of this Court who previously determined that the conditions of confinement at York County violated the Fifth Amendment have reconsidered in light of these new procedures, emphasizing that "[c]onsidering the drastic changes put into effect at [York County], and the evidence that they are able to effectively control transmission from COVID-positive inmates, . . . the improved conditions therein do not negate the Government's legitimate interest in detention."[78] In sum, the record reflects that detainees at York County now receive adequate protection from COVID-19, and Williams' conditions of confinement therefore do not amount to punishment in violation of the Constitution.

---

75 *Id.* at 3.

76 *Id.* at 7.

77 *Id.* at 6; *see ICE Guidance on COVID-19: Confirmed Cases*, Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last visited May 4, 2020).

78 *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 2025384, at *5 (M.D. Pa. Apr. 27, 2020).

### ii. *Deliberate Indifference to Medical Needs*

Turning to Williams' claim for deliberate indifference, the Constitution "prohibits any punishment which violates civilized standards and concepts of humanity and decency."[79] When applied to allegations of inadequate medical care, prison officials violate the Fifth Amendment "when they exhibit deliberate indifference to serious medical needs of prisoners."[80] That "standard requires deliberate indifference on the part of prison officials and [that] the prisoner's medical needs be serious."[81] As to the serious medical needs requirement, "[t]he detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."[82]

Deliberate indifference is demonstrated where "the custodial officials 'knew or should have known' of [a] strong likelihood" of unnecessary suffering, injury, or death.[83] Thus, "there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize [such] high risk"[84] "Therefore, the 'should have known' element . . . connotes something more than a negligent failure to appreciate the risk . . . presented

---

79 *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (internal quotation marks omitted).

80 *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (internal quotation marks omitted).

81 *Id.* (brackets, ellipsis, and internal quotation marks omitted).

82 *Id.*

83 *Id.*

84 *Id.*

[to] a particular detainee, though something less than subjective appreciation of that risk."[85] "[T]he risk of . . . injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."[86]

In light of the measures that York County has taken to protect its detainees, the Court concludes that Williams has failed to establish that prison officials have exhibited deliberate indifference to his medical needs. Although COVID-19 presents a serious medical issue, as detailed above, the facility has taken significant steps to curb the introduction or spread of COVID-19 and to contain and treat those infected with the virus. It bears repeating that, since York County implemented those changes, not a single new case of COVID-19 has been reported in that facility.[87]

Those measures—and their efficacy—demonstrate that York County recognizes the significant threat that COVID-19 poses to its detainees and has taken responsible steps to protect them. Under such circumstances, it cannot be said that Respondents have been deliberately indifferent to Williams' health, safety, or medical needs, and there certainly is no "evidence [of] an absence of any concern

---

85 *Id.*

86 *Id.*

87 Doc. 6-1 at 6; *see ICE Guidance on COVID-19: Confirmed Cases*, Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last visited May 5, 2020).

for the welfare of [their] charges."[88] To the contrary, York County has "quickly and effectively implemented the guidelines published by the CDC such that [it has] stymied any potential outbreak within [its] walls . . . and the single reported case at [York County] appears to have been effectively contained."[89] As another colleague in this District aptly stated in a recent opinion: "There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but York County Prison officials have taken reasonable steps to limit the spread throughout its facility. [Petitioner therefore] has not established a conscious disregard for the risk posed by COVID-19."[90]

Of perhaps equal significance to the steps that York County has taken is the fact that there is no evidence that Williams' medical "condition [is] such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."[91] Although Williams has been diagnosed as prediabetic,[92] there is no evidence in the record that this condition increases the risks posed to Williams by COVID-19, and the CDC does not list prediabetes as a disease that renders one more susceptible to the virus.[93] In the absence of any underlying condition that

---

[88] *Woloszyn*, 396 F.3d at 320.

[89] *Thakker*, 2020 WL 2025384, at *8.

[90] *Verma*, 2020 WL 1814149, at *6.

[91] *Woloszyn*, 396 F.3d at 320.

[92] Doc. 1 at 7.

[93] *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 1, 2020); *Coronavirus Disease 2019*

would render Williams especially susceptible to the virus, it is difficult to conclude that he is at serious medical risk, let alone that Respondents have been deliberately indifferent to that risk. Accordingly, Williams' § 2241 petition must be denied.

## III. CONCLUSION

For the foregoing reasons, Williams' motion to appoint counsel will be denied, as will his 28 U.S.C. § 2241 petition.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

*(COVID-19): Groups at Higher Risk for Severe Illness, Diabetes*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#diabetes (last visited May 1, 2020).